**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**FRANK P. PIERSANTE,**

              **Plaintiff,**          **CIVIL ACTION NO. 13-cv-11079**

    **vs.**

                             **DISTRICT JUDGE TERRENCE G. BERG**

**COMMISSIONER OF**         **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

             **Defendant.**
_____/

## REPORT AND RECOMMENDATION

Plaintiff Frank Piersante seeks judicial review of Defendant the Commissioner of Society Security's determination that he is not entitled to social security benefits for his physical and mental impairments under 42 U.S.C. § 405(g). (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment (docket no. 15) and Defendant's Motion for Summary Judgment (docket no. 17). Plaintiff filed a Response to Defendant's Motion. (Docket no. 18.) The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket no. 4.) The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation pursuant to Eastern district of Michigan Local Rule 7.1(f)(2).

I.    **RECOMMENDATION:**

The undersigned recommends that Plaintiff's Motion for Summary Judgment (docket no. 15) be GRANTED IN PART and that Defendant's Motion for Summary Judgment (docket no. 17) be DENIED. This matter should be remanded for further determination of Plaintiff's past relevant work.

## II.    PROCEDURAL HISTORY:

Plaintiff filed an application for Supplemental Security Income on July 19, 2006. Administrative Law Judge L. Zane Gill issued an unfavorable decision on April 30, 2008. Plaintiff then filed an application for Disability Insurance Benefits and an application for Supplemental Security Income with protective filing dates of June 23, 2010, alleging that he had been disabled since May 1, 2008 (the day following ALJ Gill's decision), due to problems with his knees, back pain, symptoms related to diabetes, heart problems, and depression. (*See* TR 15, 18.) The Social Security Administration denied benefits, and Plaintiff requested a *de novo* hearing, which was held on October 18, 2011, before Administrative Law Judge (ALJ) John R. Rabaut, who subsequently found that Plaintiff was not entitled to benefits because he was capable of performing his past relevant work as a "grocery manager/order clerk." (TR 15-25.) The Appeals Council declined to review the ALJ's decision, and Plaintiff commenced this action for judicial review. The parties then filed their instant Motions.

## III.    PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE, AND THE VOCATIONAL EXPERT'S TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff was 60 years old at the time of the administrative hearing and 57 years old at the time of alleged onset. (*See* TR 17.) At the time of the hearing, he owned a bungalow with his brother and lived there with his wife. (TR 41, 45-46.) Plaintiff's bedroom was on the first floor of his home, and the laundry was in the basement. (TR 41.) Plaintiff testified that he had completed 11th grade, at which time he dropped out of school to enlist for Vietnam.[1] (TR 40.) Plaintiff told the ALJ that he hadn't worked anywhere since 2008 because of a knee injury that he sustained on

---

[1]Plaintiff's enlistment was deferred because of a heart murmur. (*See* TR 40.)

2

the job.[2]  (TR 42.)  He added that his knee problems, diabetes, back problems, and circulation problems, which he had previously discussed with ALJ Gill, had gotten progressively worse since ALJ Gill's unfavorable decision in April 2008.  (TR 37.)  Plaintiff complained of hypertension with high blood pressure (TR 38-39), a heart flutter (TR 38), irregular blood sugar levels associated with diabetes (TR 38-39), circulation problems causing tingling in his hands and feet (TR 37, 52-53), and a hernia in his chest that hindered his ability to "lift anything heavy because if it bursts, [he would] have a problem."  (TR 37-38)  He also noted that he had surgery on his right knee in March 2008, but following the surgery, his knee only "seemed to weaken" and "give out a lot;" Plaintiff had trouble climbing stairs and walking long distances.  (TR 37-38.)

Plaintiff testified that his only past employment was doing stock work at various grocery-type stores.  (TR 42.)  He indicated that he was a manager at one location in 1972, but even though he was called a "manager," that position was "just doing stock work."  (TR 43.)  Plaintiff also indicated that he was a "grocery manager" at another location in 1999-2000, but that he did "everything," including stock work.  (TR 44, 59.)  Plaintiff further added that he did not have the authority to hire or fire other employees.  (TR 44, 59.)  In general, his responsibilities included ordering groceries for the dairy and frozen-food sections using a scanner (TR 44-45), rotating and facing stock (TR 61), and meeting with vendors to discuss in-store displays (TR 61-62).  Plaintiff told the ALJ that he did not handle payments and that there was "[n]ot a lot of paperwork."  (TR 45, 61.)  He noted that he would sometimes have to lift items that weighed 15 pounds, but his boss had hired "helpers" to assist whenever he had to lift anything heavy.  (TR 61-62.)  The ALJ clarified that

---

[2]Plaintiff settled a related workers compensation claim.  (*See* TR 42.)

Plaintiff was "on [his] feet . . . doing all sorts of stuff," to which Plaintiff replied, "Constantly." (TR 45.)

Plaintiff testified that his knee problems made it difficult to stand for more than 10 to 12 minutes and that his knee would get "shaky" when he walked more than a quarter mile, which Plaintiff noted was how far he would walk his "little dog." (TR 48.) He further testified that he could only lift 10 to 15 pounds. (TR 48-49.) Plaintiff told the ALJ that he took several medications for his medical issues, including Metformin, Glipizide, Lisinopril, Verapamil, and Lopressor. (TR 49.) He also noted that he found the most comfort sitting in a hard-back chair with his feet on a stool. (TR 48.) Plaintiff further stated that he took aspirin for his heart and Vicodin for his pain. (TR 50.) He noted that his doctors wanted him to take Coumadin for his heart, but he could not afford it and had no insurance. (TR 50, 51-52.) When asked by the ALJ why he was using a cane at his hearing, Plaintiff testified that it was not prescribed by a doctor, but he had been using it for about three years because his knee kept giving out. (TR 66.)

Plaintiff testified that his typical day consisted of doing "as much as [he] can," but in general, he was a "couch potato." (TR 46.) Plaintiff told the ALJ that his wife did the shopping, and while he tried to go outside, he found it difficult to stand on his leg. (TR 46.) Plaintiff further stated that he only got a solid night's sleep about 50% of the time because he drank large amounts of iced tea to control his blood sugar, which would cause him to get up to go to the bathroom. (TR 47.) Plaintiff also testified that he had a drivers' license and that he drove "pretty good," but he had to "watch [his] leg [so] it doesn't cramp up on [him]." (TR 47.)

### B.     Medical Record

Defendant asserts that "[t]he facts in this case are adequately addressed in Plaintiff's brief and the ALJ's decision." (Docket no. 17 at 2.) Having conducted an independent review of

4

Plaintiff's medical record, the undersigned agrees and will, therefore, adopt the medical history as set forth by the ALJ (TR 20-23) and as set forth by Plaintiff as follows:

In August 2004, Joseph Salama, M.D. performed a left knee arthroscopy, partial medial meniscectomy, and partial chondroplasty due to a complex tear of the left medial meniscus and degenerative arthritis. (R. 248-49). Plaintiff then underwent physical therapy. (R. 308-12, 314- 17). In May 2005, Dr. Salama performed a right knee arthroscopy, medial meniscectomy, and chrondroplasty due to internal derangement and a torn medial meniscus. (R. 253). Plaintiff then underwent physical therapy. (R. 298-307).

On February 11, 2008, Plaintiff injured his right knee at work. He was loading milk on a hand truck, slipped, and twisted his knee. (R. 325, 387). By February 14, 2008, he had increasing pain with an antalgic gait. (R. 325). A February 21, 2008 right knee MRI identified a grade three meniscal tear, high grade chondral fissuring, chondromalacia, an intraarticular loose body, moderate scarring of the fat pad, and moderate deep infrapatellar bursitis. (R. 320-22). On February 25, 2008, Plaintiff was released to work with limited use of the right knee including no prolonged standing/walking, no squatting, no kneeling, no climbing stairs or ladders, use of brace required, and no use of the company vehicle. (R. 318).

On March 10, 2008, Dr. Salama again operated on Plaintiff's right knee, performing a partial medial meniscectomy and chondroplasty due to a torn meniscus and patellofemoral chondromalacia. (R. 263). Plaintiff received 16 sessions of physical therapy between March 25 and April 29, 2008. Although his ambulation improved, he reached a plateau and had continued decreased range, strength, moderate pain, gait deviations, and inability to assume some work positions. He also had increasing pain with the progression of therapy exercises, despite good effort. Plaintiff's edema also increased slightly with decreased range and increased pain. (R. 329); *see also* (R. 332). On May 15, 2008, Plaintiff was discharged from physical therapy. He was still unable to kneel or full squat, and although he was walking daily with a 20% decrease in pain, he still continued to fatigue quickly and have fatigue with increased pain. Although he was able to walk without an assistive device, he continued to have a minimally antalgic gait. (R. 333-39).

On May 22, 2008, Dr. Salama noted Plaintiff was still having difficulty kneeling, and reviewed the physical therapy notes. Dr. Salama opined, "It is felt this man can return to work. However, he will have a job with restrictions of no bending, kneeling or squatting and avoiding stairs. If a job is available with those restrictions he can do this work. He is unable to do the regular work that he does." (R. 375), *see also* (R. 347).

On June 26, 2008, Plaintiff continued to have difficulty squatting and bending, both of which were required by his job. He had mild discomfort with knee

5

flexion and extension, and the May 22 limitations were noted as still active and would be permanent if his pain continued. (R. 377, 380). On July 24, 2008, Plaintiff returned to Dr. Salama, reporting ongoing difficulty bending, kneeling, and pushing. Dr. Salama advised Plaintiff that he could return to work with the previously noted restrictions. (R. 286, 381).

On November 20, 2008, Dr. Salama saw Plaintiff due to ongoing knee pain with difficulty going up and down stairs, bending, and kneeling despite overall improvement as compared to his pre-surgical condition. The previous restrictions were noted, and Dr. Salama opined that vocational rehabilitation with retraining would be in Plaintiff's best interest so that he could work with restrictions. (R. 383).

On February 19, 2009, Dr. Salama noted that Plaintiff had been attempting exercises on his own, but was still having some difficulty with stairs and kneeling. However, his condition was improved as compared to his pre-surgical condition. Work restrictions were continued. (R. 407). On May 26, 2009, Plaintiff saw Dr. Salama, reporting his condition was "quite static" with some difficulty with stairs and was unable to kneel, although his knee was not buckling or giving way. The same work restrictions were continued. (R. 401, 480).

On July 27, 2010, Plaintiff was evaluated by orthopedist Paul Lewis, D.O. pursuant to the workers' compensation claim. (R. 537-39). Plaintiff reported lack of improvement after the 2008 surgery, and that he attempted to return to work with the limitations set by his physician, but was fired. Plaintiff reported knee pain, and "is feeling as though he is unable to return [to work] without restrictions on him" as set by Dr. Salama. (R. 537). Upon examination, Dr. Lewis noted joint line tenderness and full range of motion with some increased symptoms with full flexion. There was also mild crepitus in the range of motion of the knee. His impression was degenerative joint disease of the right knee. However, there was no remaining surgical issue. Dr. Lewis reviewed X-rays, which he found suggested some arthritic change, and also noted "certainly there has been mention of arthritis based on the Operative Reports". (R. 538). Dr. Lewis opined that Plaintiff would not benefit from any further physical therapy, but he had ongoing arthritis in the knee, which was aggravated by the injury in 2008. He concluded that Plaintiff "should be allowed to return to work with restrictions which are sensible for an arthritic component to the knee. In particular, no repetitive bending, twisting or stooping with that right knee." (R. 539).

On September 21, 2010, Plaintiff was seen by psychologist Terrance Mills, Ph.D. for a mental status evaluation at the Commissioner's request. (R. 510-12). Plaintiff reported feeling depressed at times, and cried when he lost his last job. (R. 510). Plaintiff was not taking medication for his depression, was having difficulty sleeping, and reported difficulty concentrating with no energy and his mind racing. Dr. Mills noted low self-esteem and motivation with slowed motor activity, a sad

6

affect and depressed mood. (R. 511). Dr. Mills diagnosed Major Depressive Disorder, Moderate with a guarded prognosis. (R. 512).

On December 2, 2010, Plaintiff was examined by internist Jai Prasad, M.D. at the Commissioner's request. (R. 513-19). Plaintiff reported difficulty stooping, kneeling, and bending due to his knee problem, in addition to other health problems including prior abdominal surgeries, diabetes, high blood pressure, and depression. (R. 514). Plaintiff reported his hypertension caused headache and dizziness, and his knees were painful and always stiff. (R. 515). Upon examination, Dr. Prasad noted a scarred abdomen with a ventral hernia, sensory loss in fingers of both hands, chest pain precipitated by exertion or lifting objects, some peripheral edema in both legs, and numbness and tingling of both legs attributed to diabetic neuropathy. Dr. Prasad also noted decreased range of motion of the cervical and lumbar spine. (R. 516). Knee range of motion was also reduced. (R. 517, 519). A lumbar spine X-ray identified mild diffuse spondylosis with mild multilevel degenerative disc disease, worse at L1-L2. (R. 513). Dr. Prasad's opinion was that Plaintiff had "uncontrolled hypertension, which despite medications, is very high [at] 180/100 mmHg. He has chest pain, so he has hypertensive heart disease with peripheral edema." Although knee X-rays were not available, Dr. Prasad opined that Plaintiff had mild arthritis in both knees. Peripheral neuropathy and mild retinopathy due to non-insulin dependent diabetes was noted. Dr. Prasad opined that Plaintiff needed better management of his hypertension and diabetes, which was complicated by neuropathy and retinopathy. He also needed an X-ray of both knees to determine the extent of his arthritis, and should also have a cardiac stress test. (R. 517).

(Docket no. 15 at 7-11 (footnote omitted).) The undersigned will incorporate additional comments and citations as necessary throughout this Report and Recommendation.

## C.   Vocational Expert's Testimony

After acknowledging that his testimony would be consistent with the Dictionary of Occupational Titles (DOT), the VE testified that he was familiar with Plaintiff's past work. (TR 56-57.) He noted that Plaintiff's past work included two positions. The VE categorized the first position as "grocery stock," which he classified as "unskilled, medium work for the DOT, medium for the claimant, as performed by the claimant per the file." (TR 58.) Then, after some clarification

by Plaintiff,[3] the VE categorized Plaintiff's second position as "a grocery order clerk," with DOT number 219.367-030."  The VE classified this position as "semi-skilled, SVP-4," that was "light per the DOT and light per the claimant's testimony."  (TR 63.)

The ALJ then asked the VE to consider a hypothetical individual who would perform sedentary work and could not climb ladders, rope, or scaffolds; could only occasionally climb ramps or stairs; could occasionally balance, stoop, crouch, or kneel; could not crawl; and had to avoid all exposure to unprotected heights and concentrated exposure to extreme cold, heat, wetness, and humidity. (TR 63.)  The ALJ asked whether such a person could perform Plaintiff's past work.  (TR 63.)  The VE responded, "No."  (TR 63.)

The ALJ then asked the VE to assume that the hypothetical individual had all of the same limitations noted in his first hypothetical, except the individual would be limited to light work instead of sedentary work.  (TR 64.)  The VE testified that such an individual "[c]ould perform the order clerk position."  (TR 65.)

The ALJ then asked the VE to consider the following somewhat disjointed  hypothetical: "[An individual] at medium occasional ramps or stairs; no constant – or with occasional ladders, ropes, scaffolds; no constant ramps, stairs, balancing, stooping, crouching, only occasional kneeling, only occasional crawling; again avoiding all exposure to unprotected heights."  (TR 65.)  The VE testified that such an individual could perform the "stock position at the medium level."  (TR 65.)

The ALJ also asked the VE whether an individual could perform the "stock work" position while using a "handheld assistive device," like a cane. (TR 67.)  The VE testified that an individual

---

[3]The undersigned included Plaintiff's testimony with regard to his clarification in Section III.A, *supra*.  (*See also*, TR 58-62.)

8

could not perform that job one-handed.  (TR 67.)  Plaintiff's non-attorney representative had no follow-up questions for the VE.  (*See* TR 69.)

## IV.   ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that Plaintiff met the insured status requirements of the act through June 30, 2010; that Plaintiff had not engaged in substantial gainful activity since May 1, 2008, the alleged onset date; and that Plaintiff suffered from the following severe impairments: "HTN, mild DDD lumbar spine; status post knee meniscectomy/DJD; diabetes; and atrial fibrillation."  (TR 17-18.) The ALJ also found, however, that Plaintiff's depressive disorder was nonsevere and that his impairments did not meet or equal those listed in the Listing of Impairments.  (TR 18.)  The ALJ then found that Plaintiff was "less than fully credible" and that despite his contentions otherwise, Plaintiff had "the residual functional capacity to perform light work . . . except "no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs, balance, stooping, crouching, and kneeling; no crawling; should avoid concentrated exposure to extreme cold, extreme heat, and wetness or humidity; and should avoid all exposure to unprotected heights."  (TR 19-24.)

In reliance on the VE's testimony, the ALJ found that Plaintiff's past relevant work included "grocery stock (DOT code 922.687-058), which is unskilled, medium work, and as a grocery manager/order clerk (DOT code 219.367.030), which is semi-skilled, light work."  (TR 17.)  The ALJ then found that Plaintiff was capable of performing his past relevant work as a grocery manager/order clerk, "which is a semi-skilled, light jobs (sic) as generally performed in the national economy."  (TR 24.)  Therefore, the ALJ concluded that Plaintiff had not been under a disability at any time from May 1, 2008, through the date of the ALJ's decision.  (TR 25.)

## V.   LAW AND ANALYSIS

### A.   Standard of Review

9

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

## B.    Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)    Plaintiff was not presently engaged in substantial gainful employment; and

10

(2)     Plaintiff suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     Plaintiff did not have the residual functional capacity (RFC) to perform relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

## C.     Analysis

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)). Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of

11

the [Commissioner], with or without remanding the cause for a hearing.  42 U.S.C. § 405(g).  Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration."  *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174).  Plaintiff argues that this matter should be remanded or reversed under sentence four because (1) the ALJ erred in his assessment of the medical opinions of record, (2) the ALJ erred when he failed to include in his hypothetical questions to the VE all of the limitations in the medical opinion to which he gave "significant weight," (3) the ALJ erred when he found Plaintiff "less than fully credible," and (4) the ALJ erred when he found that Plaintiff could perform his past relevant work as a "shipping order clerk."  (*See* docket no. 15.)

### 1.      The ALJ's Assessment of the Medical Opinions of Record

The ALJ must give a treating physician's opinion complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2).  It is equally well settled that the ultimate issue of disability is reserved to the Commissioner and not the treating or examining physician.  *Kidd v. Comm'r*, 283 Fed. Appx. 336, 341 (6th Cir. 2008).  Thus, when a medical or non-medical source offers an opinion on "an issue reserved to the Commissioner, such as whether the claimant is disabled, the ALJ need not accord that opinion controlling weight."  *Id.* (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007)).  The opinion of an examining source is generally accorded more weight than is the opinion of a source who did not examine the claimant.   20 C.F.R. § 404.1527(c)(1).  The opinion of a state agency medical or psychological consultant is reviewed in the same manner as is the opinion of a nonexamining physician or psychologist.  20 C.F.R. §404.1527(e).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson v. Comm'r*, 378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5 (1996)). If the opinion of a treating source is not afforded controlling weight, an ALJ must apply certain factors in determining what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544 (citation omitted). Even then, a finding that a treating-source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4.

Additionally, the Sixth Circuit has upheld the decision of an ALJ which gave less than controlling weight to a treating physician without specifically analyzing the factors set forth in 20 C.F.R. § 404.1527(c) where the ALJ provided "good reason" for the decision. *See Infantado v. Astrue*, 263 Fed.Appx. 469, 473-74 (6th Cir.2008). There is no per se rule that requires an articulation of each of the six regulatory factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). *Norris v. Comm'r*, No. 11-11974, 2012 WL 3584664, at *5 (E.D. Mich. Aug. 20, 2012) (citing *Tilley v. Comm'r*, 394 Fed. Appx. 216, 222 (6th Cir. 2010)). Moreover, an ALJ's failure to discuss the factors of § 1527(c)(2)-(6) may constitute harmless error (1) if "a treating source's opinion is so

patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of [Section 1527(c)]—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Nelson v. Comm'r*, 195 Fed. Appx. 462, 470 (6th Cir. 2006) (citing *Wilson v. Comm'r*, 378 F.3d 541, 547 (6th Cir. 2004)).

Plaintiff asserts that the ALJ erred when he rejected the opinion of Plaintiff's treating physician, Dr. Salama, "and instead assign[ed] 'greater weight to the treatment notes than to the [functional capacity] opinion.'" (Docket no. 15 at 13 (quoting TR 21).) Plaintiff asserts that "[i]t is unclear how the ALJ is making a distinction between the opinion and the treatment notes" because Dr. Salama's opinion is included in the treatment notes and because the treatment notes support Dr. Salama's opinion. (*Id.*) Defendant argues that the ALJ's analysis was proper and that Dr. Salama's opinion conflicted with his own treatment notes and with Dr. Lewis's opinion. (Docket no. 17 at 8-12.)

There is no dispute that Dr. Salama was Plaintiff's treating physician. (*See* docket no. 17 at 8-12.) Thus, his opinion is entitled to complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record. The ALJ noted that "[o]n May 22, 2008, Dr. Salama indicated that the claimant's right knee was slowly improving," that "[p]ain upon kneeling was appreciated," and that "claimant was observed walking without an assistive device." He then acknowledged that "Dr. Salama opined that the claimant could return to work with the restrictions of no stooping, squatting, bending, kneeling, pushing, pulling, or use of stairs." (TR 21.) The ALJ later noted that on July 24, 2008, Dr. Salama's examination indicated "no effusion, no instability, and full flexion and extension at the right knee,"

and that "claimant showed improvement, but reported difficulty bending, kneeling, and pushing."
(TR 21.)  The ALJ also noted that, on May 26, 2009, Dr. Salama indicated that Plaintiff "reported
difficulty with stairs and that he was unable to kneel[, but h]e denied knee buckling or giving away."
(TR 21.)  Again, physical examination findings included "no effusion or instability, and full flexion
and extension."  (TR 21.)  And at that time, the ALJ states, Dr. Salama opined that Plaintiff "could
continue to work with the same restrictions imposed on May 22, 2008.  (TR 21.)

The ALJ then decided to afford "greater weight to the treatment notes than to [Dr. Salama's]
opinion."  (TR 21.)  The ALJ reached this conclusion because the opinion "is not entirely supported
by the objective and other substantial evidence of the record" and because "the treatment notes do
not substantiate Dr. Salama's conclusion."  (TR 21.)  The ALJ also stated that he considered "the
length, frequence, nature, and extent of the treatment relationship, the supportablity and consistency
of the physician's conclusions, and the specialization of the physicians as required in this Circuit."
(TR 21.)

The undersigned acknowledges that the ALJ's discussion of the factors set forth in Section
202.1527(d) was, arguably, insufficient and that his distinction between Dr. Salama's treatment
notes and his opinions is unclear.  Nevertheless, the undersigned finds that even if the ALJ's analysis
was incomplete, the ALJ's conclusion resulted in harmless error because his determination of
Plaintiff's RFC is consistent with Dr. Salama's opinion.  While neither party addressed this matter,
the ALJ overlooked a record from June 26, 2008, wherein Dr. Salama modified Plaintiff's
restrictions: "[Plaintiff] can return to work.  He should *avoid excessive* bending, kneeling, or
squatting."  (TR 474 (emphasis added).)  Thus, when Dr. Salama referred to the "same restrictions"
in his May 26, 2009 opinion, he was referring to his June 2008 opinion, not is May 2008 opinion.
(*See* TR 480.)  Therefore, Plaintiff's RFC, which restricts him to "occasional . . . balancing,

15

stooping, crouching, and kneeling" is entirely consistent with Dr. Salama's actual restrictions to "avoid excessive bending, kneeling, or squatting," regardless of whether the ALJ (and the Parties) overlooked this distinction. (*Compare* TR 19, *with* TR 474, 480.)

## 2.   The ALJ's Application of Dr. Lewis's Restrictions

The ALJ assigned "significant weight to [Dr. Lewis's opinion] to the extent that it is consistent with the residual functional capacity assessed in [the ALJ's decision]." (TR 22.) Plaintiff argues that even if the ALJ properly gave more weight to Dr. Lewis's opinion in lieu of Dr. Salama's opinion, the ALJ failed to include all of the restrictions in Dr. Lewis's opinion in Plaintiff's RFC and in the questions presented to the VE. (Docket no. 15 at 14-15.) Specifically, Plaintiff argues that Dr. Lewis found that Plaintiff should avoid bending, twisting, and stooping with his right knee while the ALJ only restricted Plaintiff's climbing, balancing, stooping, crouching, kneeling, and crawling; the ALJ did not account for any limitations in bending or twisting. (*Id.* at 15.)

Plaintiff's analysis of this argument relies on the premise that the ALJ must include in his questions to the VE all limitations that he finds credible. (*Id.*) Plaintiff's argument may be legally correct, but his assertion is based on the false conclusion that "the ALJ explicitly credited" Dr. Lewis's limitations with regard to bending and twisting. (*See id.*) While the ALJ acknowledged that Dr. Lewis restricted Plaintiff's bending and twisting and then found Dr. Lewis's opinion "well supported" and deserving of "significant weight," he did not "explicitly credit" Dr. Lewis's findings with regard to bending and twisting. To the contrary, the ALJ qualified his support of Dr. Lewis's opinion by affording it weight only "to the extent that it is consistent with the residual functional capacity." (TR 22.) Plaintiff has cited no authority to suggest that the ALJ must include in his RFC

16

determination all of the limitations included in an opinion to which he gives significant weight. Therefore, Plaintiff's argument fails.

### 3.     Plaintiff's Credibility

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997).   But Credibility assessments are not insulated from judicial review.   Despite the deference that is due, such a determination must nevertheless be supported by substantial evidence.  *Id.*  An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'"  *Id.*  "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Further, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2).  The ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than

medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations

and restrictions due to the pain.  *See* 20 C.F.R. § 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d

1027, 1039-40 (6th Cir. 1994) (applying these factors).

Plaintiff asserts that while "the ALJ provided rationale in support of his credibility finding[,]

. . . his rationale is flawed."  (Docket no. 15 at 16.)  Plaintiff argues that the ALJ erred in finding that

Plaintiff's statements conflicted with Dr. Salama's opinions and treatment notes, that the ALJ erred

when he found that Plaintiff "takes little pain medication," that the ALJ erred when he found that

"the objective evidence of record weighs heavily against the claimant's allegations," and that the

ALJ erred when he found that Plaintiff's daily activities were inconsistent with his allegations.  (*Id.*

at 15-17.)

The ALJ discussed Plaintiff's credibility as follows:

I find the claimant to be less than fully credible, with the allegations regarding limitations being significantly inconsistent with the record.  First, the objective medical evidence of record weighs heavily against the claimant's allegations in this case, as set forth above.  In addition, no treating physician indicated that the claimant was disabled since the alleged onset date.  When considering the state agency report, the results of an independent medical evaluation, and the claimant's daily activities of driving and walking his dog, I find the claimant is capable of work as set forth in more detail in the residual functional capacity, particularly noting the absence of any significant longitudinal treatment history to the contrary.  Further, the residual functional capacity addresses demands that might exacerbate the claimant's symptomatology, as well as having considered the location, duration, frequency, and intensity of the symptomatology.  In addition, the record fails to indicate any significant side effects from medications.

(TR 24.)  As part of his discussion, and noted "as set forth above" in his credibility analysis, the ALJ

found that "Dr. Salama returned the claimant to work with no weight restrictions within 30 days of

the alleged onset date" even though claimant asserts that he can lift only 10 to 12 pounds, and that

"claimant takes little pain medication and is not dependent on insulin to manage his diabetes."  (TR

23.)  The ALJ also noted that while Plaintiff "testified that he uses a non-prescribed cane," he "did not present for clinical examinations with an assistive device."  (TR 23.)

Plaintiff correctly notes that there is evidence supporting some of his claims.  For example, Dr. Salama's opinion is consistent with Plaintiff's claims of postural limitations.  (*See* docket no. 15 at 16.)  And medical records do reflect that Plaintiff took Darvocet and Vicodin for pain.  (*See id.*)  Moreover, the medical records are consistent with Plaintiff's complaints of knee pain and postural limitations.  (*See id.* at 15.)  Nevertheless, the undersigned finds that these consistencies are not sufficient to overturn the ALJ's credibility determination.  As Defendant contends, the evidence also supports the ALJ's findings.  For example, Plaintiff did not present to any examinations with the cane that he stated he had used for three years; records do note that Plaintiff took pain medications, but the records are consistent with the ALJ's determination that the use was not extensive; and the objective medical evidence shows minimal abnormality following Plaintiff's surgeries.  (*See* docket no. 17 at 15-17.)  Thus, there is substantial evidence in support of the ALJ's decision.  And where the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella*, 708 F.2d at 1059, and even if substantial evidence also supports the opposite conclusion.  *See Her,* 203 F.3d at 389-90.

### 4.    Plaintiff's Past Relevant Work

Plaintiff asserts that "Plaintiff's past relevant work was improperly classified as DOT 219.367-030, a 'shipping-order clerk.'"  (Docket no. 15 at 18.)  The undersigned agrees.  DOT 219.367-030 sets forth the job of a "Shipping-Order Clerk (clerical)" as follows:

> Requisitions transportation from freight carriers to ship plant products. Reads shipping orders to determine quantity and type of transportation needed. Contacts carrier representative to make arrangements and to issue instructions for loading

products. Annotates shipping orders to inform shipping department of loading location and time of arrival of transportation. May perform other clerical tasks, such as typing and mailing bills, typing correspondence, and keeping files.

DOT Code 291.367-030, *available at* http://www.occupationalinfo.org/21/219367030.html.

Plaintiff, however, indicated that while he held the title "grocery manager," he did "everything," including stock work. (TR 44, 59.)  His responsibilities included ordering groceries, but he also rotated and faced stock, and met with vendors to setup in-store displays. (TR 44-45, 61-62.)  He specifically told the ALJ that he did not do a lot of paperwork and that he was on his feet "constantly." (TR 45.)  Plaintiff's work was not "clerical," as set forth in the description of a Shipping-Order Clerk.[4]  Moreover, Defendant implicitly acknowledges that Plaintiff's past relevant work was improperly classified by not arguing otherwise.  This, however, does not end the Court's inquiry as Defendant, instead, relies on the premise that the ALJ did not err because Plaintiff's non-attorney representative failed to properly challenge the VE's testimony. (*See* docket no. 17 at 19-21.)

SSR 00-4p provides that the adjudicator must resolve a conflict between the DOT and the VE "before relying on the VE . . . evidence."  SSR 00-4p.  But "[n]othing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct."  *Id.* (quoting *Martin v. Comm'r*, 170 F. App'x 369, 374 (6th Cir. 2006)).  To the contrary, "an administrative law judge [need not] conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the administrative law judge."  *Ledford v. Astrue*, 311 Fed. Appx. 746, 757 (6th Cir. 2009).  Nevertheless, the evidence of the conflict between

---

[4]The undersigned notes that the ALJ relied on the VE's incorrect testimony in reaching his conclusion. (*See* TR 62-63.)

Plaintiff's job as performed and the VE's classification under the DOT that is now before the Court "casts doubt on the evidence the ALJ relied on to make [his] determination."[5]  *Underwood v. Comm'r of Soc. Sec.*, No. 12-12633, 2013 WL 3851002, *3 (E.D. Mich. July 25, 2013) (Tarnow, J.) (adopting Report and Recommendation of Majzoub, M.J.).  Therefore, the Court recommends remanding this matter for further determination of Plaintiff's past relevant work.

## VI.    CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Summary Judgment (docket no. 15) should be GRANTED IN PART, and Defendant's Motion for Summary Judgment (docket no. 17) should be DENIED.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991);

---

[5]It appears that the VE reviewed Plaintiff's past work and classified it as "grocery stock" before the hearing.  Then, after Plaintiff's testified that he had some managerial duties, the VE made an on-the-spot modification to his report that added the "grocery order clerk" position. (*See* TR 57-63.)  While the ALJ is not required to investigate the accuracy of a witness's testimony, the undersigned finds it troubling that the ALJ failed to at least review at the DOT description under Code 219.367-030.  Such a review would have shown the discrepancy between Plaintiff's "stock" position and the DOT "clerical" position.

*Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: February 4, 2014            s/ Mona K. Majzoub_____
                                   MONA K. MAJZOUB
                                   UNITED STATES MAGISTRATE JUDGE

## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: February 4, 2014            s/ Lisa C. Bartlett___
                                   Case Manager